UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. **02-80088 CR-FERGUSON**

18 U.S.C. 371
18 U.S.C. 2
15 U.S.C. 78j(b)
15 U.S.C. 78ff(a)
17 C.F.R. 240.10b-5

MAGISTRATE JUDGE
SNOW

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
vs. )
)
PAUL D. LEMMON and )
MARK VALENTINE, )
)
Defendants. )
_____)

### INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

1. Voyager Group Ltd. ("Voyager"), a corporation with its principal place of business in Bermuda, purported to be a full-service financial services company. Voyager was also a member of the Bermuda Stock Exchange.

2. Defendant **PAUL D. LEMMON** was the founder and managing director of Voyager.

3. Thomson Kernaghan & Co. ("Thomson Kernaghan") was a company that was a securities broker-dealer located in Toronto, Ontario, Canada.

4. Defendant **MARK VALENTINE** was the chairman of Thomson Kernaghan.



5. C-Me-Run ("CMER") was purportedly an Internet computing company incorporated in Delaware and Maryland, with headquarters in the state of Washington. Although CMER's stock was not traded on an exchange, it was publicly traded in the United States as an over-the-counter security under the ticker symbol "CMER."

6. SoftQuad Software Ltd. ("SoftQuad" or "SXML") was a Delaware-based holding company of SoftQuad Software Inc., an Ontario-based corporation. Although SoftQuad's stock was not traded on an exchange, it was publicly traded in the United States as an over-the-counter security under the ticker symbol "SXML."

7. JagNotes.com Inc. ("JagNotes" or "JNOT") was a Nevada corporation headquartered in New Jersey. Although JagNotes's stock was not traded on an exchange, it was publicly traded in the United States as an over-the-counter security under the ticker symbol "JNOT."

8. Defendant **MARK VALENTINE** owned and controlled a majority of the stock of CMER, SXML, and JNOT.

9. An agent of the Federal Bureau of Investigation, acting in an undercover capacity, posed as a corrupt securities trader for a fictitious stock mutual fund on behalf of a number of investors who had invested approximately $800 million in the fund.

10. Connelly & Williams Associates, Inc. ("Connelly & Williams") was the purported United States representative of the stock mutual fund. Connelly & Williams was purportedly located in Atlanta, Georgia.

11. Two cooperating witnesses posed as corrupt stock promoters and consultants who presented prospective stock deals to the undercover agent's mutual fund.

## COUNT 1

### Conspiracy to Commit Wire, Mail, and Securities Fraud

12. The allegations in paragraphs 1-11 of this Indictment are incorporated by reference as though fully set forth herein.

13. From on or about December 13, 1999, through on or about at least the date of this Indictment, in Palm Beach and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

**PAUL D. LEMMON and
MARK VALENTINE,**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

  a. to knowingly and willfully devise a scheme and artifice to defraud and deprive others of the intangible right of honest services, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346;

  b. to knowingly and willfully devise a scheme and artifice to defraud and deprive others of the intangible right of honest services, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, to cause to be delivered by the United

States Postal Service and by commercial interstate carrier, according to the directions thereon, certain matters and things, in violation of Title 18, United States Code, Sections 1341 and 1346; and

      c. directly and indirectly, to knowingly and willfully use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security in contravention of rules and regulations prescribed by the Securities and Exchange Commission as necessary and appropriate in the public interest and for the protection of investors, as alleged in Counts 2 and 3 of this Indictment, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## OBJECTS OF THE CONSPIRACY

14. It was the purpose and object of the conspiracy for the defendants to unlawfully enrich themselves by defrauding the undercover agent's mutual fund and by fraudulently causing the price of CMER, SXML, and JNOT stock to be artificially increased through payoffs and kickbacks to brokers that were undisclosed to the undercover agent's mutual fund so that the defendants' CMER, SXML, and JNOT stock could be sold at a higher value than it was actually worth. It was also the object of the conspiracy for the defendants to unjustly enrich themselves by defrauding the shareholders of CMER, SXML, and JNOT.

## MANNER AND MEANS OF THE CONSPIRACY

15. It was a part of the conspiracy that the undercover agent's mutual fund would purchase approximately $9.4 million's worth of CMER stock from Thomson Kernaghan and **MARK VALENTINE**.

16. It was also a part of the conspiracy that the undercover agent and the cooperating witnesses would receive a 30% undisclosed cash bribe or "kickback" for themselves from **PAUL**

**D. LEMMON** and **MARK VALENTINE** on the $9.4 million CMER stock purchase.

17. It was also a part of the conspiracy that the undercover agent's mutual fund would purchase approximately $10 million's worth of JNOT stock from Thomson Kernaghan and **MARK VALENTINE**.

18. It was also a part of the conspiracy that the undercover agent and the cooperating witnesses would receive a 25% undisclosed cash bribe or "kickback" for themselves from **PAUL D. LEMMON** and **MARK VALENTINE** on the $10 million JNOT stock purchase.

19. It was also a part of the conspiracy that the undercover agent's mutual fund would purchase approximately $10 million's worth of SXML stock from Thomson Kernaghan and **MARK VALENTINE**.

20. It was also a part of the conspiracy that the undercover agent and the cooperating witnesses would receive a 25% undisclosed cash bribe or "kickback" for themselves from **PAUL D. LEMMON** and **MARK VALENTINE** on the $10 million SXML stock purchase.

21. It was also a part of the conspiracy that **PAUL D. LEMMON** and **MARK VALENTINE** would cause brokers to receive undisclosed kickbacks for manipulating and artificially increasing the prices of CMER, JNOT, and SXML stock, and for maintaining the artificially high prices of CMER, JNOT, and SXML stock for a period of months by arranging for the sale of CMER JNOT, and SXML stock to customers of brokers whom **PAUL D. LEMMON** and **MARK VALENTINE** caused to be enlisted in the scheme by bribing them.

22. It was also a part of the conspiracy that **PAUL D. LEMMON** and **MARK VALENTINE** would receive for themselves the bulk of each of the remaining multi-million-dollar purchases.

23. It was also a part of the conspiracy that prior to each of the multi-million-dollar trades, the undercover agent's mutual fund would purchase approximately $25,000's worth of CMER, JNOT, and SXML stock, respectively, from Thomson Kernaghan and **MARK VALENTINE** as "test trades."

24. It was also a part of the conspiracy that **PAUL D. LEMMON** and **MARK VALENTINE** would cause the undercover agent to receive a $20,000 kickback on each of the $25,000 "test trades" so the undercover agent could give the undisclosed kickbacks to his purported mutual fund due diligence officers to place CMER, JNOT, and SXML on a list of companies approved for purchase by the undercover agent's mutual fund so that the multi-million-dollar deals could proceed at a later date.

25. It was also a part of the conspiracy that **PAUL D. LEMMON** would generate a false paper trail to make it appear as though the $20,000 kickbacks were payment to the undercover agent for legitimate research ostensibly performed.

## OVERT ACTS

26. In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in Palm Beach and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, by one or more co-conspirators:

    a. On or about August 28, 2000, **PAUL D. LEMMON** had a telephone conversation with the cooperating witnesses in which he expressed a general interest in committing securities fraud with the cooperating witnesses.

    b. On or about November 2, 2000, **MARK VALENTINE** had a telephone conversation with the cooperating witnesses and the undercover agent in which **MARK**

**VALENTINE** confirmed that the cooperating witnesses and undercover agent would receive a 30% undisclosed kickback on CMER.

c. On or about November 7, 2000, **MARK VALENTINE** had a telephone conversation with the cooperating witnesses about how **MARK VALENTINE** would effect the $20,000 kickback to the undercover agent to be used to pay off Connelly & Williams's due diligence officers to place CMER on the list of stocks approved for the undercover agent's mutual fund to purchase.

d. On or about November 8, 2000, **PAUL D. LEMMON** and **MARK VALENTINE** had a telephone conversation with the cooperating witnesses about the instructions regarding where the cooperating witnesses and the undercover agent should wire the $25,000 for the purchase of the CMER stock "test trade" and the necessity to return the $20,000 kickback quickly to the undercover agent so that he would be able to bribe the Connelly & Williams due diligence officers to place CMER on the list of stocks approved for the undercover agent's mutual fund to purchase.

e. On or about November 14, 2000, **PAUL D. LEMMON** and **MARK VALENTINE** had a telephone conversation with the cooperating witnesses in which **PAUL D. LEMMON** and **MARK VALENTINE** confirmed that **PAUL D. LEMMON** would make the $20,000 undisclosed kickback to the cooperating witnesses and the undercover agent on the $25,000 purchase of CMER.

f. On or about November 15, 2000, **PAUL D. LEMMON** had a telephone conversation with the cooperating witnesses and the undercover agent in which **PAUL D. LEMMON** stated that he was going to send the undercover agent a fraudulent invoice for $20,000 falsely showing that the undercover agent had performed legitimate research, to cover the $20,000

undisclosed kickback on the CMER stock purchase.

g. On or about November 15, 2000, **PAUL D. LEMMON** and **MARK VALENTINE** caused the wire transfer of $25,000 from the undercover agent's bank account in Miami, Florida, through New York to Voyager's account at Thomson Kernaghan in Toronto, Ontario, Canada.

h. On or about November 17, 2000, **PAUL D. LEMMON** and **MARK VALENTINE** caused the wire transfer of $25,000 from Thomson Kernaghan's Omnibus Account to the undercover agent's bank account in Miami, Florida, as a kickback to provide to the undercover agent's mutual fund due diligence officers.

i. On or about November 20, 2000, **MARK VALENTINE** had a telephone conversation with the cooperating witnesses and the undercover agent in which, upon learning that Thomson Kernaghan had accidentally wired the undercover agent a $25,000 kickback instead of a $20,000 kickback on the CMER transaction, **MARK VALENTINE** told the cooperating witnesses and the undercover agent to hold the $5,000 as a credit towards the kickback on the next securities fraud deal that they would execute.

j. On or about November 23, 2000, **MARK VALENTINE** had a personal meeting with the undercover agent and the cooperating witnesses about the structure of the SXML stock sale to the undercover agent's mutual fund.

k. On or about November 30, 2000, **MARK VALENTINE** had a telephone conversation with the cooperating witnesses in which, upon learning that the undercover agent's mutual fund did not intend to proceed with the $8 million CMER stock trade, **MARK VALENTINE** asked whether he could have his $20,000 kickback returned, and eventually agreed

to consider the $20,000 CMER kickback as the kickback for the JNOT stock "test trade."

l. On or about December 4, 2000, **PAUL D. LEMMON** had a telephone conversation with the cooperating witnesses and the undercover agent in which they agreed to execute the stock deal with respect to JNOT before executing the SXML deal.

m. On or about December 6, 2000, **PAUL D. LEMMON** had a telephone conversation with the cooperating witnesses and the undercover agent in which **PAUL D. LEMMON** discussed the undisclosed kickbacks to the brokers for manipulating the stock price of JNOT.

n. On or about December 8, 2000, **MARK VALENTINE** had a telephone conversation with the cooperating witnesses and the undercover agent in which **MARK VALENTINE** outlined the undisclosed compensation for the brokers who would be manipulating the price of JNOT stock.

o. On or about January 2, 2001, **MARK VALENTINE** had a telephone conversation with the cooperating witnesses and the undercover agent in which **MARK VALENTINE** stated that his goal was to manipulate the price of SXML stock to approximately $4.50 to $5.00 per share.

p. On or about January 9, 2001, **MARK VALENTINE** had a telephone conversation with the cooperating witnesses and the undercover agent in which **MARK VALENTINE** stated that he would consider paying a 30% undisclosed kickback to the cooperating witnesses and the undercover agent on the SXML transaction.

q. On or about January 16, 2001, **MARK VALENTINE** and **PAUL D. LEMMON** caused the wire transfer of $10,000 from the undercover agent's bank account in Miami, Florida, through New York to Thomson Kernaghan in Toronto, Ontario, Canada, for the purchase of SXML

stock as a "test trade."

r. On or about January 16, 2001, **MARK VALENTINE** and **PAUL D. LEMMON** caused Thomson Kernaghan in Toronto to send by private carrier a trade confirmation for the purchase of approximately 3,278 shares of SXML to the cooperating witnesses and the undercover agent in Florida.

s. On or about January 17, 2001, **MARK VALENTINE** and **PAUL D. LEMMON** caused Thomson Kernaghan in Toronto to send by foreign and United States mail a trade confirmation for the purchase of approximately 3,278 shares of SXML to the cooperating witnesses and the undercover agent in Florida.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2 & 3

### Securities Fraud

27. The allegations in paragraphs 1 through 11 and 14 through 26 of this Indictment are adopted as though realleged in their entirety herein.

28. On or about the dates specified below, in Palm Beach and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, the defendants,

**PAUL D. LEMMON and
MARK VALENTINE,**

directly and indirectly, and by the use of the means and instrumentalities of interstate commerce, and of the mails, knowingly and willfully used and employed manipulative and deceptive devices and contrivances, to wit, (a) employing a device, scheme, and artifice to defraud, (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading, and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, in connection with the purchase and sale of a security, in contravention of rules and regulations prescribed by the Securities and Exchange Commission as necessary and appropriate in the public interest and for the protection of investors, as specified in the separate counts below:

| COUNT | APPROXIMATE DATE | SECURITIES TRANSACTION |
|---|---|---|
| 2 | 11/17/00 | Sale of approximately 3,094 shares of CMER stock to Connelly & Williams for approximately $25,000. |
| 3 | 1/16/01 | Sale of approximately 3,278 shares of SXML stock to Connelly & Williams for approximately $10,000. |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

A TRUE BILL

_____
FOREPERSON

_____
GUY A. LEWIS
UNITED STATES ATTORNEY

_____
ROBIN S. ROSENBAUM
ASSISTANT UNITED STATES ATTORNEY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# PENALTY SHEET

Defendant's Name:    PAUL D. LEMMON    No.: _____

Count # I:

Securities Fraud Conspiracy; in violation of 18:371

*Max Penalty: Five years' imprisonment; $250,000 fine

Count # II:
Securities Fraud; in violation of 15:78j(b) and 78ff

*Max Penalty: Ten years' imprisonment; $1,000,000 fine

Count # :

*Max Penalty:

Count # :

*Max Penalty:

Count # :

*Max Penalty:

Count # :

*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV. 12/12/96

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### PENALTY SHEET

Defendant's Name: __MARK VALENTINE__   No.: _____

Count # I:

Securities Fraud Conspiracy; in violation of 18:371

*Max Penalty: Five years' imprisonment; $250,000 fine

Count # II:
Securities Fraud; in violation of 15:78j(b) and 78ff

*Max Penalty: Ten years' imprisonment; $1,000,000 fine

Count # :

*Max Penalty:

Count # :

*Max Penalty:

Count # :

*Max Penalty:

Count # :

*Max Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.**

REV. 12/12/96

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA    CASE NO. _____

v.    **CERTIFICATE OF TRIAL ATTORNEY***

PAUL D. LEMON, and    **Superseding Case Information**:
MARK VALENTINE

**Court Division**: (Select One)    New Defendant(s)    Yes ___    No ___
                                    Number of New Defendants ___
___ Miami    ___ Key West    Total number of counts ___
___ FTL    _x_ WPB    ___ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:    (Yes or No) __No__
   List language and/or dialect   __English__

4. This case will take __15__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)    (Check only one)

   I    0 to 5 days    ___    Petty    ___
   II   6 to 10 days   ___    Minor    ___
   III  11 to 20 days  _X_    Misdem.  ___
   IV   21 to 60 days  ___    Felony   _X_
   V    61 days and over ___

6. Has this case been previously filed in this District Court?  (Yes or No) __No__
   If yes:
   Judge: _____    Case No. _____
   (Attach copy of dispositive order)

   Has a complaint been filed in this matter?  (Yes or No) __No__
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____  District of _____

7. Does this case originate from a matter pending in the U. S. Attorney's Office prior to April 1, 1999? __ Yes _X_ No   If yes, was it pending in the Central Region? __ Yes __ No

8. Did this case originate in the Narcotics Section, Miami? __ Yes _X_ No

                                    /s/ Robin S. Rosenbaum
                                    ROBIN S. ROSENBAUM
                                    ASSISTANT UNITED STATES ATTORNEY
                                    Florida Bar No. 908223

*Penalty Sheet(s) attached    REV.6/27/00
N:\HPantaleo\ROSENBAUM\LEMMON&VALENTINE\INDPKG.wpd

No. 5015

# UNITED STATES DISTRICT COURT
Southern District of Florida
Central Criminal Division

## THE UNITED STATES OF AMERICA

vs.

PAUL D. LEMMON, and
MARK VALENTINE

## INDICTMENT
18 U.S.C. §371
18 U.S.C. §2
15 U.S.C. §78j(b)
15 U.S.C. §78ff(a)
17 C.F.R. 240.10b-5

A true bill.

_____
Foreperson

Filed in open court this _____ day,
of _____ A.D. 2002

_____
Clerk

Bail, $ _____