UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No.: 02-80088-CR-FERGUSON

UNITED STATES OF AMERICA,

Plaintiff,

v.

PAUL D. LEMMON,

Defendant.
_____

DEFENDANT'S OBJECTIONS AND CLARIFICATIONS TO THE
PRESENTENCE INVESTIGATION REPORT

Defendant PAUL D. LEMMON, by and through his undersigned counsel hereby files the following objections and clarifications to the Presentence Investigation Report ("PSI") that was prepared in connection with this matter. Essentially, the defendant objects to the PSI in so far as it incorrectly overstates the amount of the actual or intended loss in this government "sting" operation, and it fails to include a three-level reduction for an incomplete conspiracy under Section 2X1.1 of the Sentencing Guidelines. Mr. Lemmon also seeks to clarify certain other matters contained in the PSI so as to accurately reflect his background, financial condition and

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 02-80088-CR-FERGUSON

other matters related to the present offense. Specifically, Mr. Lemmon's objections and clarification to the PSI are as follows:

## I.   Objections to the PSI:

### Paragraph 30: Specific Offense Characteristics (Loss amount)

Defendant Lemmon objects to Paragraph 30 of the PSI in that it incorrectly increases the defendant's base offense level by fourteen (14) levels, pursuant to §2F1.1(b)(1)(O), based on an intended loss figure of more than $5,000,000 but less than $10,000,000. In this case, no actual loss in fact resulted from this government "sting" operation (Code named: Operation Bermuda Short). However, the "intended" loss figure appears to have been arbitrarily selected by the government (or by its "cooperating witnesses"), which has unfairly increased each defendant's sentencing exposure under the Guidelines. As set forth below, the defendant maintains that his offense level should be determined based on an intended loss of no more than between $1,500,000 and $2,500,000. As a result, the defendant's base offense level should have been increased by only twelve (12) levels rather than increased by fourteen (14) levels as reflected in the PSI.

In this case, the government's cooperating witnesses ("CWs") discussed with Mr. Lemmon and numerous other individuals (who had no prior securities fraud convictions or disciplinary history) the possibility of utilizing a foreign mutual fund to invest in several publicly traded start-up companies (including New Anaconda Company ("NANA"), CT Cosmetics, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 02-80088-CR-FERGUSON

("CCHO"), C-Me-Run, Inc. ("CMER"), SoftQuad Software, Ltd ("SXML") and JagNotes.com ("JNOT").[1] Although most of the proceeds from the Fund's investment were to be used to finance the company itself, a portion of those monies (generally about 25%) were to be returned to as a "kickback," which reflects the theoretical "intended loss" from the scheme.

Initially the CWs suggested to Mr. Lemmon that the Fund would be willing to invest approximately $8 million into each of these various companies.[2] However, as described below, due to various internal problems with each of the specific transactions involved it became essentially impossible for the Fund to have invested more than a total of about $8 million. Thus, the theoretical intended loss (for the kickback of 25-30%) would have only been approximately $2,000,000 to $2,400,000.

---

[1] According to the Brady/Giglio disclosures made by the government in discovery, both of the CWs had a long history of securities law violations; they had worked at numerous "penny stock" firms that are now defunct; they owned and managed other penny stock firms (directly or through nominees); and they had been supposedly removed from the securities industry as a result of SEC/NASD disciplinary actions. While supposedly banned from the industry, the CWs continued committing securities frauds while acting as "stock promoters" in the South Florida area, including participating in a stock fraud involving Sky Scientific that caused $20-40 million in actual investor losses. In fact, one of the CWs had also just been criminally convicted for securities fraud in another district, when they approached the government to "cooperate" against others in this sting operation. At that time, the CWs proposed that the government conduct a "sting" operation, which they claimed would yield 100+ targets. The CWs had never even met Mr. Lemmon at that time, and Mr. Lemmon was never involved in any of their prior fraudulent activities.

[2] In most of the government's "Operation Bermuda Short" cases, the government's targets were told that the Fund had $8 million to invest in any particular deal. However, in this case, the CWs arbitrarily told the defendants that they could invest $6 million in one of the deals (CCHO), and up to $10 million on two of the deals (SXML and JNOT). The completely arbitrary manner in which the CWs selected the amounts to be invested by the Fund (and thus the amount of the "kickbacks"), highlights the inherent unfairness to the defendants from calculating relevant conduct based upon arbitrarily inflated figures.

3

With respect to the NANA transactions, the CWs initially advised Mr. Lemmon that the Fund would purchase $8 million of "free-trading" shares purchased at a discount to the market. In fact, however, there was not enough free-trading shares available in the market for the Fund to make that purchase; when the CWs were advised that only "restricted" shares were available for purchase, they confirmed that this would not be acceptable to the Fund. As a result, only a test transaction involving a $20,000 kickback was actually completed; because there was not enough "free-trading" shares available for purchase, Mr. Lemmon had no intent or ability to complete the larger transaction, and therefore, no additional theoretical or intended loss resulted.

Likewise, with respect to the CCHO transaction, the CWs advised that the Fund would invest approximately $6 million to purchase free-trading shares in the market. However, CCHO had not yet been approved for trading in the public markets by the National Association of Securities Dealers, Inc. ("NASD"). Moreover, neither Mr. Lemmon, nor any of his co-conspirators had the ability to cause the NASD to allow trading in this stock to begin. In addition, CCHO had not even filed the required paperwork with the NASD (i.e., a Form 15c-211) to cause them to begin their lengthy review and comment process, which would have been necessary if trading was ever going to be approved by the NASD. As a result, although the CWs discussed CCHO with Mr. Lemmon, it would have been impossible for the Fund to have been able to make their purchase of free-trading shares. As a result, only a test transaction involving a small quantity of restricted shares occurred, which generated a "kickback" of approximately $20,000. Because CCHO's stock was not publicly trading,

4

Mr. Lemmon had no intent or ability to complete the larger transaction, and therefore, no additional theoretical or intended loss resulted.

In a similar vein, the CW's discussed the possibility of having the Fund invest in CMER, SXML, and JNOT. However, after several discussions, it was agreed that the Fund would invest in these companies on a sequential basis, i.e., only after the first financing transaction was successfully completed, would a second transaction be commenced with the next company. As a result, only $8 million of the Fund's monies were ever theoretically "in play." None of the transactions were completed; essentially, the CWs were playing a "shell-game" switching the same supposed $8 million investment from one company to the next. At most, the transactions resulted in an actual "kickback" of approximately $35,000, and theoretical or intended loss of approximately $2,000,000 (i.e., approximately 25-30% of $8,000,000).

Thus, for relevant conduct purposes, the defendant's offense level should have only been increased by twelve (12) levels for a loss figure of between $1,500,000 and $2,500,000.

**Paragraph 30: Specific Offense Characteristics (Incomplete conspiracy)**

Defendant Lemmon objects to Paragraph 30 of the PSI in that it utilized Section 2F1.1 exclusively in determining the defendant's offense level without regard to Guidelines Section 2X1.1 (Attempt, Solicitation or Conspiracy); as set forth below, a proper application of Section 2X1.1 would have resulted in the defendant receiving a three (3) level reduction in his total offense level for a case involving only a partially completed offense.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 02-80088-CR-FERGUSON

Application Note 10 to Guidelines Section 2F1.1 provides that: "In the case of a partially completed offense (e.g., an offense involving a completed fraud that is part of a larger, attempted fraud), the offense level is to be determined in accordance with the provisions of §2X1.1 (Attempt, Solicitation, or Conspiracy) whether the conviction is for the substantive offense, the inchoate offense (attempt, solicitation, or conspiracy), or both; see Application Note 4 in the Commentary to §2X1.1." USSG §2F1.1, comment (n.10).

In a case involving a conspiracy, Section 2X1.1(b)(2) provides a three (3) level reduction unless the defendant or a co-conspirator completed all the acts necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control. See USSG §2X1.1(b)(2). Application Note 4 explains:

> "In certain cases, the participants may have completed (or have been about to complete but for apprehension or interruption) all of the acts necessary for the successful completion of part, but not all, of the intended offense. In such cases, the offense level for the count (or group of closely related multiple counts) is whichever of the following is greater: The offense level for the intended offense minus 3 levels (...), or the offense level for the part of the offense for which the necessary acts were completed (or about to be completed but for apprehension or interruption). For example, where the intended offense was the theft of $800,1000 but the participants completed (or were about to complete) only the acts necessary to steal $30,000, the offense level is the offense level for the theft of $800,000 minus 3 levels, or the offense level for the theft of $30,000, whichever is greater.

See USSG §2X1.1, comment (n.4).

In this case, the intended loss from the conspiracy reflected the amount of the supposed "kickback" that was to be generated from transactions with the Fund. As indicated above, that figure was approximately $2,000,000 to $2,400,000, which would have caused a twelve (12) level increase to the defendant's base offense level under Section 2F1.1. After applying the three (3) level reduction in Section 2X1.1, the defendant's offense level should have been increased by only nine levels for the specific offense characteristics (i.e., loss amount), computed as follows:

| | |
|---|---|
| Loss amount from §2F1.1(b)(M) | (+ 12) |
| Adjustment for incomplete conspiracy | ( -3) |
| Specific Offense adjustment | + 9 |

Using the actual loss figure (i.e., the $75,000 "kickback" from the three "test transactions"), the defendant's offense level would have only been increased by 6 levels for this specific offense characteristic under §2F1.1(b)(G)

Pursuant to §2X1.1, the defendant's offense level for this special offense characteristic should have been calculated as the greater of the offense level for the intended loss minus 3 levels (i.e., level 9), or the offense level for the completed offense (i.e., level 6). Using that comparison, paragraph 30 of the PSI should have reflected an increase of nine (9) levels rather than an increase of fourteen (14) levels under §§2F1.1 and 2X1.1. See also, United States v. Khawaja, 118 F.3d 1454 (11th Cir. 1997).

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 02-80088-CR-FERGUSON

**Paragraphs 35 and 39: Adjusted Offense Level; Total Offense Level:**

The defendant objects to ¶¶35 and 39 of the PSI, which indicates that he has an Adjusted Offense Level (subtotal) and a Total Offense Level of 22 and 19, respectively. The Defendant submits that ¶¶35 and 39 of the PSI should reflect an offense level of 17 and 14, respectively, after properly adjusting the loss amount in paragraph 30 as reflected above.

**Paragraph 79: Guideline Imprisonment Range**

The defendant objects to ¶79 of the PSI, which indicates that his Total Offense Level is 19 and his guideline imprisonment range 30 to 37 months. As indicated above, the Defendant submits that a proper application of the guidelines will reflect a Total Offense level of 14, and a guideline imprisonment range of 15 to 21 months.

**Paragraph 85: Guideline Fine Range**

The defendant objects to ¶85 of the PSI, which indicates that the fine range for the instant offense is from $6,000 to $60,000. The defendant submits that, after taking effect of the adjustments mentioned above, the defendant's Total Offense Level is 14, and his guideline fine range is $4,000 to $40,000.

**II.   Defendant's Clarification to the PSI**

**Paragraph 13:**

The defendant wishes to clarify that he was a co-founder (with Mr. Proctor) of the Voyager Group, and was not the sole founder of that entity. Additionally, the defendant notes that the name

8

of the entity was the "Voyager Group," not "Voyager Group, Ltd." The defendant also wishes to clarify that portion of paragraph 13 that suggests that "Lemmon, Proctor and Derome would receive the bulk of the remaining 75% of the $8 million." In fact, the net proceeds (i.e., the 75%) were to be used for the benefit of the NANA company, itself.

**Paragraph 14:**

Line 4 should reflect that Mr. Lemmon sent the CD Rom specifically at the request of the CWs and Mr. DeRome. Line 5 should reflect the company as "NANA" rather than "NADA."

**Paragraphs 15 and 19:**

Line 1 should reflect Mr. Lemmon as a co-founder (not founder) of Voyager, as indicated above in Paragraph 13.

**Paragraph 16:**

Line 2 should reflect "Voyager Select IPO Fund Ltd." rather than "Voyager Securities Initial Public Offering Fund."

**Paragraphs 18 and 20:**

These paragraphs state that "...Lemmon said he had prepared a fraudulent invoice...". Mr. Lemmon wishes to clarify that he did not actually refer to the invoice in that manner.

**Paragraph 46:**

The last sentence indicates that the defendant advised the Probation Officer that he and his wife own the home located in New Maryland, New Brunswick. Mr. Lemmon wishes to clarify that this home has always been owned solely by his wife, Darlene, since its purchase.

**Paragraph 58:**

Mr. Lemmon wishes to clarify that designations he received as a "Certified Investment Manager" and as a "Fellow of the Canadian Securities Institute," are not licenses, nor do they allow for trading privileges (although Mr. Lemmon is proud to have received these designations).

**Paragraphs 60 and 71:**

Mr. Lemmon wishes to clarify that he does not intend to utilize Optima to provide consulting services in the future, and hopes to dispose of this entity in the near future.

**Paragraphs 65 and 75 (Financial Condition)**:

Mr. Lemmon wishes to clarify that his wife's income is incorrectly stated in paragraph 65 and 75 of the PSI; her net income should be reflected at approximately $1585 per month. Accordingly, the defendant's Net Monthly Cash Flow should be re-computed to reflect this change.

**Paragraph 67:**

Mr. Lemmon wishes to clarify that he is not the beneficial owner of the Cromwell and/or Safford accounts. These are accounts that belong to several of his former clients; he was listed as a

director and signatory on the accounts but he did not (and does not) have any entitlement to those funds.

**Paragraph 73:**

Mr. Lemmon wishes to clarify that Alexander is his son (not his daughter); the property is held in a trust for him as he is not of age (age 5). Mr. Lemmon has no ownership interest in the property.

Respectfully submitted,

By: _____

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy hereof has been furnished to Roger Stefin United States Attorney's Office, 500 E. Broward Blvd., Suite 700, Ft. Lauderdale, Florida 33394; Donna Wilmot, U.S. Probation Officer, 299 E. Broward Blvd., Room 409, Ft. Lauderdale, Florida 33301-1168; and to the Defendant this 18th day of February, 2003.

ATTERBURY, GOLDBERGER, &
RICHARDSON, P.A.
250 Australian Avenue South, Suite 1400
West Palm Beach, Florida 33401
(561) 659-8300
Fax: (561)835-8691

_____
JACK A. GOLDBERGER, ESQUIRE
Florida Bar No. 262013